# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | **Chapter 11** |
| | ) | |
| **CHEF SOLUTIONS HOLDINGS, LLC, _et al._,[1]** | ) | **Case No. 11-13139 (KG)** |
| | ) | |
| Debtors. | ) | **Joint Administration Pending** |
| | ) | |

## DECLARATION OF SUSAN SARB, CHIEF FINANCIAL OFFICER, SENIOR VICE PRESIDENT AND SECRETARY OF DEBTORS IN SUPPORT OF FIRST DAY MOTIONS

I, Susan Sarb, being fully sworn, hereby declare that the following is true to the best of my knowledge, information, and belief:

1.      I am the Chief Financial Officer, Senior Vice President and Secretary of each of the following entities:  Chef Solutions Holdings, LLC, CS Distribution Holdings, LLC, CS Distributors, Inc. of Ohio, CS Prepared Foods Holdings, LLC, Chef Solutions Inc., Orval Kent Holdings, Inc., Orval Kent Intermediate Holdings, Inc., Orval Kent Parent LLC, Orval Kent Food Company, LLC and Orval Kent Food Company of Linares, LLC (each a "Debtor" and collectively, the "Debtors").  The Debtors' corporate offices are located at 120 W. Palatine Rd. in Wheeling, Illinois 60090. CS Distributors, Inc. of Ohio is an Ohio corporation.  Each of the other Debtors, including the lead Debtor, Chef Solutions Holdings, LLC ("Chef Solutions Holdings"), is a Delaware entity.  In my capacity as Chief Financial Officer, Senior Vice President and Secretary of each of the Debtors, I am familiar with the Debtors' day-to-day operations, financial condition, books and records and business affairs.

---

[1]  The debtors in these cases, along with the last four digits of the federal tax identification number for each of the debtors, where applicable are Chef Solutions Holdings, LLC [5382], CS Distribution Holdings, LLC [5461], CS Distributors, Inc. of Ohio [7075], CS Prepared Foods Holdings, LLC [5434], Chef Solutions Inc [8101], Orval Kent Holdings, Inc. [4307], Orval Kent Intermediate Holdings, Inc. [4420], Orval Kent Parent, LLC [4553], Orval Kent Food Company, LLC [8408] and Orval Kent Food Company of Linares, LLC [0418].  The debtors' corporate offices are located at 120 W. Palatine Rd. Wheeling, IL 60090.

2.	On October 4, 2011 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

3.	To minimize any adverse effects on their business as a result of the commencement of these chapter 11 cases (the "Chapter 11 Cases"), the Debtors intend to request various types of relief in certain "first day" applications and motions (collectively, the "First Day Motions"). The First Day Motions seek relief, among other things, to: (a) continue the Debtors' operations while in chapter 11 with as little disruption as possible; (b) maintain the confidence and support of key constituencies and (c) establish procedures for the smooth and efficient administration of these chapter 11 cases. Gaining and maintaining the support of the Debtors' employees and other key constituencies, as well as maintaining the day-to-day operations of the Debtors' business with minimal disruption, will be crucial to the success of the Debtors' efforts in the Chapter 11 Cases.

4.	I submit this declaration (this "Declaration") in support of the First Day Motions. Except as otherwise indicated, all statements in this Declaration are based on my personal knowledge, my review of relevant documents or my opinion based upon my experience and knowledge of the Debtors' operations and financial condition. If I were called upon to testify, I could and would testify to each of the facts set forth herein based on such personal knowledge, review of documents or opinion. I am authorized to submit this Declaration on behalf of the Debtors.

# I.

## GENERAL BACKGROUND

### A.    Overview of the Debtors' Businesses

5.    Chef Solutions Holdings was formed on June 9, 2004 to acquire the operating business of Chef Solutions Inc ("Chef Solutions").  Chef Solutions Holdings indirectly owns and controls Chef Solutions, whose primary operating subsidiary, Orval Kent Food Company, LLC ("Orval Kent"), operates food preparation plants in Baxter Springs, Kansas; Delphos, Ohio and Vista, California and also has a distribution facility in Hidalgo, Texas.  Orval Kent also has a sales office in Bentonville, Arkansas, and formerly operated plants in Wheeling, Illinois and San Diego, California.  Two non-Debtor Mexican entities, Orval Kent de Linares SA de CV and Orval Kent Food Company SA de CV (the "Mexican Non-Debtors"), which are also indirectly owned and controlled by Chef Solutions Holdings, own and operate the Mexican processing facilities in Linares, Mexico.

6.    Orval Kent is the second largest manufacturer in North America of fresh prepared foods for retail, foodservice and commercial channels.  Orval Kent manufactures proprietary private label and branded products that are developed in collaboration with retail, foodservice and commercial accounts.  Founded in 1952, Orval Kent has developed its category leading market position by delivering superior tasting, innovative and high quality products that enhance customers' fresh food offerings.  Orval Kent offers a broad product range including side dishes, deli salads, fresh cut fruit, dips and component salad kits that provide premium quality and meet or exceed industry standards for food safety.

7.    As a direct result of its high quality and broad product range, Orval Kent has developed long-term relationships with the nation's largest retail, foodservice and commercial accounts.  Such retailers include, among others, Wal-Mart, Sam's, Supervalu, Trader Joe's, H-E-

B, Safeway, Costco and such foodservice accounts include, among others, Sysco, U.S. Foodservice and Ruby Tuesday. Orval Kent has built long-term customer loyalty with an average tenure of nearly 15 years for its top 10 customers. Orval Kent's revenue mix is well diversified with approximately 70% of sales derived from the retail channel, approximately 23% of sales derived from the foodservice channel, and approximately 7% of sales derived from the commercial channel.

8.      While Orval Kent has been in existence for over 50 years, it has recently emerged as a leader in the fresh prepared foods category. This emergence began after certain funds managed by Questor Management Company ("Questor Funds") purchased Chef Solutions in 2004 from an affiliate of Lufthansa. At the time of such purchase, Chef Solutions operating business included Orval Kent as well as Pennant Foods, a frozen baked goods business, and I&K, a fresh foods distributor. However, Questor sold Pennant and I&K in October 2006 and February 2007, respectively, with the goal of repositioning Chef Solutions' operating business into a full-line provider of value-added fresh prepared foods. This repositioning was further aided by Chef Solutions' 2005 acquisition of Fish House Foods, a premium value-added salad manufacturer. This acquisition enhanced Orval Kent's product offerings and strengthened pre-existing customer relationships. Additionally, Orval Kent implemented a supply chain optimization program that enhanced Orval Kent's capabilities in value-added manufacturing, product development and food safety. As one of the final steps in this optimization plan, Orval Kent closed its Wheeling, Illinois manufacturing plant in February 2009, which generated more than $8 million in annual cost savings. Also in 2009, certain funds managed by Mistral Capital Management, LLC ("Mistral Funds") completed an investment in Chef Solutions Holdings to

recapitalize Orval Kent's balance sheet and provide growth capital to pursue several customer opportunities and cost saving initiatives.

## B. The Debtors' Capital, Management and Debt Structure

### (i) Capital Structure

9. The Debtors' corporate structure is set forth on the organizational chart attached hereto as <u>Exhibit A</u>. Chef Solutions Holdings is the ultimate parent of each of the other Debtors and is privately owned. As such, there is no established public trading market for the limited liability company interests ("<u>Units</u>") in Chef Solutions Holdings or the equity in any of the other Debtors. Chef Solutions Holdings is owned by Questor Funds, Mistral Funds and former and current officers, directors and management of the Debtors ("<u>Individual Holders</u>").

10. As of the Petition Date, the equity in Chef Solutions Holdings is comprised of preferred Units ("<u>Preferred Units</u>") and common Units ("<u>Common Units</u>"). The Preferred Units are senior in the capital structure to the Common Units. Additionally, each successive series of Preferred and Common Unit are junior in the capital structure to the prior series of such Unit. The Preferred Units are comprised of the following two series of such Units: series "A" and series "B". All of the outstanding series "A" Preferred Units are held by Mistral Funds and all of the outstanding series B Preferred Units are held by a Questor Fund. The Common Units are comprised of the following six series of such Units: series "A-1", "A-2", "B", "C", "D" and "E". There are currently no outstanding series "A-1" or "A-2" Common Units. Questor Funds hold an overwhelming majority of the outstanding series "B" Common Units and the Individual Holders and Fish House Foods hold a small minority of such Units. The series "C", "D" and "E" Common Units are all held by Individual Holders.

### (ii) Management Structure

11.     As is mentioned above, Chef Solutions Holdings directly or indirectly owns and controls each of the other Debtors.  Pursuant to the Fifth Amended and Restated Operating Agreement of Chef Solutions Holdings, dated as of October 27, 2010 (the "LLC Agreement"), the business and affairs of Chef Solutions Holdings are managed by, or under the direction of, its board of directors (the "Board").  Under the LLC Agreement, the Board was comprised of four non-voting directors ("Non-Voting Directors") and six voting directors ("Voting Directors"). Further, under the LLC Agreement, Mistral Funds were entitled to designate three Voting Directors and two Non-Voting Directors and Questor Funds were entitled to designate two Voting Directors and two Non-Voting Directors.  The Chief Executive Officer of the Chef Solutions Holdings was the final Voting Director.

12.     Pursuant to an amendment (the "Amendment") to the LLC Agreement, which was prompted by an impending restructuring and executed on September 12, 2011, by and among Mistral Funds and Questor Funds, Questor Funds gave up their rights to designate any of the Board's directors with certain caveats.  Further, shortly after the Amendment's execution, each of the Voting and Non-Voting Directors appointed by Questor Funds resigned from the Board. The Amendment also provided for the ability of Mistral Funds to designate an independent director (the "Independent Director") whose express approval and consent would be required in the event that Chef Solutions Holdings and/or its subsidiaries commenced chapter 11 cases and entered into a sale transaction.  On September 12, 2011, the current Voting Directors designated Robert F. Troisio as the Independent Director. The Independent Director is not affiliated with the Chef Solutions Holdings or any subsidiary thereof or any Mistral Fund.[2]

---

[2] The definition of Independent Director in the Amendment is as follows:

(Continued)

### (iii)    Prepetition Loan Facilities

13.    Certain of the Debtors are party to a Loan and Security Agreement, dated as of September 29, 2006 (the "Prepetition Senior Loan Agreement"), with the lenders from time to time party thereto (the "Senior Prepetition Lenders"), and Wells Fargo Capital Finance, Inc., as the arranger and administrative agent for the Senior Prepetition Lenders (in such capacity, the "Senior Prepetition Agent").   Since the date it was executed, the Prepetition Senior Loan Agreement has been amended twenty-three times and was most recently amended on September 30, 2011 (as amended the "Amended Prepetition Senior Loan Agreement").  Under the Amended Prepetition Senior Loan Agreement, certain of the Debtors are borrowers and certain of the Debtors are guarantors.

14.    Pursuant to such agreement, the Senior Prepetition Lenders made loans and advances to the Debtors in the form of a revolving credit facility, which included a subfacility for the issuance of letters of credit (the "Senior Prepetition Credit Facility").   These loans and advances are secured by liens on substantially all of the Debtors' properties and assets (the "Senior Prepetition Liens").  The maximum revolver amount under this agreement is $38 million and is reduced in accordance with, among other things, mandatory prepayments.   As of the Petition Date, the Debtors owe only approximately $23 million, including accrued and unpaid interest on the Senior Prepetition Credit Facility, and approximately $1.3 million in outstanding letters of credit and standby letters of credit (the "Senior Prepetition Obligations").

---

a natural person who, for the five-year period prior to his or her appointment as Independent Director has not been, and during the continuation of his or her service as Independent Director is not:  (i) an employee, manager, stockholder, partner or officer of [any of the Debtors] (other than his or her service as an Independent Director or similar capacity of [any of the Debtors]; (ii) a customer or supplier of [any of the Debtors] (other than an Independent Director provided by a corporate services company that provides independent managers in the ordinary course of its business); or (iii) any member of the immediate family of a person described in (i) or (ii).

15.     Pursuant to amendments to the Prepetition Senior Loan Agreement and amended and restated participation agreements, dated as of March 18, 2011 and September 8, 2011 (the "Prepetition Participation Agreements"), between the Senior Prepetition Agent and Mistral Chef Holdings, LLC ("Mistral Chef"),  Mistral Chef is the holder of a $3.3 million junior participation (the "Mistral Prepetition Participation") in the Senior Prepetition Credit Facility.  Other than as set forth in the Prepetition Participation Agreement and the Prepetition Senior Loan Agreement, the Mistral Prepetition Participation has all of the same rights and benefits as a Senior Prepetition Lender in the Senior Prepetition Credit Facility.

16.     Certain of the Debtors are also party to an Amended and Restated Securities Purchase and Security Agreement, dated as of October 27, 2010 (the "Prepetition Note Purchase Agreement"), with Mistral Chef and the other noteholders party thereto (the "Prepetition Noteholders"), and Mistral Capital Management, LLC, as agent (the "Prepetition Noteholder Agent").  Under such agreement, certain of the Debtors are, among other things, issuers and guarantors.  Pursuant to the Prepetition Note Purchase Agreement, the Prepetition Noteholders originally purchased $12 million in original principal amount of the issuer Debtors' 15% notes and later purchased an additional $8 million in original principal amount of such notes, the terms of which have been amended from time to time.

17.     All of the Debtors' obligations to the Prepetition Noteholders under the Prepetition Note Purchase Agreement (the "Junior Prepetition Obligations") are also secured by liens on substantially all of the Debtors' properties and assets (the "Junior Prepetition Liens"). Pursuant to an intercreditor and subordination agreement between the Prepetition Noteholder Agent and the Senior Prepetition Agent, the Junior Prepetition Liens are junior in all respects to the Senior Prepetition Liens and the Junior Prepetition Obligations are junior in all respects to

8

the Senior Prepetition Obligations. As of the Petition Date, the Debtors owe approximately $24.3 million under the Prepetition Note Purchase Agreement, including accrued and unpaid interest.

C.   **Events Leading to the Chapter 11 Filing**

18.   Over the course of the past few years, both internal and external factors contributed to negative trends in the Debtors' revenue and profitability figures. The Debtors' sales reached a recent peak of approximately $220 million in net sales in 2008, but gradually decreased to approximately $209 million in 2010. As discussed above, the Debtors attempted to successfully reposition themselves as a prepared food supplier for cost-conscious consumers. However, maintaining such a market position required the Debtors to operate under tight cost constraints with relatively thin profit margins. The far-reaching impacts of the 2008 recession, as well as increased competition, placed additional downward pressure on the Debtors' pricing, profitability and liquidity. At the same time, rising fuel costs and commodity prices exacerbated an already harsh market for food manufacturers, including the Debtors.

19.   In addition to the market-driven difficulties faced by the Debtors in recent years, several internal factors contributed to the Debtors' financial difficulties. The Debtors' Delphos, Ohio plant experienced repeated equipment failures in 2009 and 2010 which significantly compromised production and output. The Debtors' attempts to market and sell higher-value items gained little traction as economic concerns caused consumers to shy away from such items. Finally, continuing liquidity problems, including litigation commenced against the Debtors and payments due under various settlement agreements, prevented the Debtors from implementing several planned growth initiatives and investment opportunities.

20.   As a result of the aforementioned difficulties encountered, the Debtors have experienced a significant deterioration of profitability and liquidity over the past year. The

Debtors' Gross Margin has declined from approximately 8% for fiscal year 2010 to 4% for the 8 months ended August 31, 2011. Additionally, the Debtors Adjusted Unaudited Earnings Before Interest Tax and Depreciation have steadily declined from approximately $10 million for the twelve month period ended August 2010 to negative $4 million for the comparable August 2011 period.

21. Given the accelerating deterioration of the Debtors' financial and operating performance, the Debtors engaged PricewaterhouseCoopers ("PwC") as their financial advisor in February of 2011 to (i) assist in negotiations with the Senior Prepetition Agent and the Senior Prepetition Lenders to restructure the Senior Prepetition Credit Facility, (ii) explore various refinancing and recapitalization alternatives and (iii) formulate a solution to the Debtors' liquidity needs. Following a thorough review of the Debtors' recent and projected financial performance, the Debtors concluded that their forecasted revenue, profitability and liquidity were, and would continue to be, insufficient to adequately fund both the Debtors' business operations and their debt service requirements. As a result, the Debtors, assisted by their professional advisors, commenced a process to explore several strategic restructuring alternatives.

22. During February and March 2011, PwC assisted the Debtors in contacting several prospective lenders to determine their interest in either providing new debt financing or in refinancing the Senior Prepetition Credit Facility. In addition to speaking with potential financing providers, the Debtors continued to be actively involved in negotiations with the Senior Prepetition Agent. The Debtors received two indications of interest from prospective financing providers, as well as a proposal from the Senior Prepetition Agent to amend the Senior Prepetition Credit Facility. After a thorough review and analysis of the submitted indications of

interest, the Debtors, in consultation with their professional advisors, determined that the best alternative to the Debtors, their liquidity and the ongoing operations of the business, was to amend the Senior Prepetition Credit Facility. This amendment resulted in $3,000,000 of incremental liquidity to the Debtors and certain covenant relief.

23.     In February 2011, the Debtors also engaged Piper Jaffray & Co. ("PJC") as their investment banker to assist the Debtors in exploring various strategic restructuring alternatives, specifically related to a potential sale of the Debtors' assets. PJC lead a targeted marketing process in contemplation of a proposed sale of the Debtors' assets as an ongoing concern. Following this initial marketing, the Debtors and PJC commenced a bidding process among the various prospective buyers for the purchase of the Debtors' assets as a going concern. From February 2011 to May 2011, as directed by the Debtors, PJC contacted parties to determine their interest in the acquisition of the Debtors' assets. PJC contacted approximately 40 potential bidders, 27 of which negotiated confidentiality agreements and received a Confidential Information Memorandum. Interested parties were asked to submit preliminary bids in May 2011.

24.     As a result of their prepetition marketing efforts, five parties submitted initial indications of interest. PJC assisted the Debtors in analyzing the proposals and clarifying terms with each of the bidders. PJC provided additional due diligence to each of the bidders. In addition, the Debtors' management conducted telephonic management presentations and site visits for two such bidders.

25.     In June 2011, after a review and analysis of all submitted indications of interest, the Debtors ultimately decided that a capital investment into the Debtors' business provided the highest valuation and the best terms for the Debtors, and selected a potential investor with whom

to move forward.  This potential investor contemplated providing an equity investment into the Debtors that would provide the Debtors with adequate liquidity to continue operations and hopefully effectuate a turnaround of the operations.  Beginning in June 2011, PJC and the Debtors initiated negotiations with the potential investor with the goal of closing on the investment expeditiously.  The potential investor continued more detailed due diligence while documentation and discussions were ongoing.  However, in July 2011, the potential investor informed the Debtors that, due to its own circumstances, it was unable to move forward with the proposed investment in the Debtors.

26.     Upon learning that the potential investor could not move forward, the Debtors advised PJC to re-engage Reser's Fine Foods, Inc. ("Reser's"), who submitted an initial indication of interest, in the restructuring process.  In August 2011, PJC contacted Reser's to determine whether they were still interested in pursuing a purchase of the Debtors.  Reser's indicated such  continued interest.

27.     Soon thereafter, the Debtors' advisors met with Reser's to negotiate and execute a stalking horse asset purchase agreement, whereby substantially all of the Debtors' assets would be acquired pursuant to a sale supervised by the bankruptcy court.  Reser's bid for the Debtors contemplated partnering with Mistral Chef to bid using cash and Mistral Chef's credit bid on its notes issued under the Prepetition Note Purchase Agreement.  While Reser's and Mistral Chef's advisors negotiated the terms of the joint venture agreement between such parties, PJC and the Debtors' other advisors assisted in negotiating the terms of the stalking horse asset purchase agreement and preparing the Debtors for a chapter 11 filing.

### D.      Proposed Sale of the Debtors' Assets

28.     On or about October 4, 2011, the Debtors and RMJV, L.P. (the "Purchaser"), which is a Delaware limited partnership whose partners are RFF, LLC, an affiliate of Reser's,

and Mistral Chef, entered into that certain Asset Purchase Agreement (the "Stalking Horse Agreement") whereby the Purchaser has agreed to purchase substantially all of the Debtors' assets. Pursuant to the terms of the Stalking Horse Agreement, the aggregate consideration for the Debtors' assets shall include (a) $36,439,595 in cash as described in Section 3.1 of the Stalking Horse Agreement, (b) a credit bid of $25,300,000 and (c) the assumption of the Assumed Liabilities.[3] The Stalking Horse Agreement provides the Debtors with a firm commitment that is not subject to any financing or due diligence contingencies and thereby provides the Debtors with a floor against which other bidders can submit competing bids. The Stalking Horse Agreement allows for the Debtors' creditors to benefit from the going concern value of their businesses, and also achieves a preservation of jobs, assumption and assignment of a substantial numbers of contracts and leases, as well as the Stalking Horse Bidder's agreement to assume a significant number of administrative expense claims not paid prior to closing.

29. The Debtors will be filing a motion (the "Sale Motion") on or about the Petition Date seeking, inter alia, (i) the entry of an order (a) establishing bidding and auction procedures (the "Bidding Procedures") in connection with the sale of the Debtors' assets, (b) approving proposed bid protections, including the payment of a reasonable break-up fee and actual and reasonable out of pocket legal and other fees and expenses, (c) scheduling an auction (the "Auction") and setting a date and time for the sale hearing (the "Sale Hearing") and (d) establishing procedures for noticing and determining cure amounts for contracts and leases to be assumed and assigned in connection with the sale transaction; and (ii) at the Sale Hearing, subject to the results of the Auction, the entry of an order (a) approving and authorizing a sale to the winning bidder, (b) authorizing the assumption and assignment of certain contracts and leases

---

[3] Capitalized terms used herein but not defined shall have the meaning ascribed to such terms in the Stalking Horse Agreement.

and (c) authorizing the Debtors to enter into a transition services agreement as contemplated by the Stalking Horse Agreement.

30.     Consistent with the Stalking Horse Agreement and taking into account the extensive prepetition marketing process discussed above, the Sale Motion proposes the following timeline:

| Action | Deadline |
|---|---|
| Bidding Procedures Hearing | October 19, 2011 |
| Proposed Bid Deadline | November 7, 2011 |
| Auction | November 9, 2011 |
| Sale Hearing | November 11, 2011 |

31.     The Bidding Procedures, including the proposed timeline, are designed to maximize the value received for the Debtors' assets and to facilitate a fair and open process in which all interested bidders may participate.

### E.     The DIP Facilities

32.     In connection with the Chapter 11 Cases, Chef Solutions, CS Distributors, Inc. of Ohio and Orval Kent Food Company, LLC, as borrowers (the "DIP Borrowers"); CS Prepared Foods Holdings, LLC, CS Distribution Holdings, LLC, Orval Kent Food Company of Linares, LLC, Orval Kent Holdings, Inc., Orval Kent Intermediate Holdings, Inc., and Orval Kent Parent, LLC, as guarantors, the lenders from time to time party to the Wells DIP Facility Agreement (as defined below); and Wells Fargo Capital Finance, Inc. ("Wells" or the "Agent," and together with the other lenders under the Wells DIP Facility Agreement, each a "Wells Lender," and collectively, the "Wells Lenders"), have entered into that certain Loan and Security Agreement (the "Wells DIP Facility Agreement"). Pursuant to the Wells DIP Facility Agreement, the Wells Lenders have agreed to provide the Wells Borrowers with postpetition financing up to the

aggregate principal amount of $28 million (the "Wells DIP Facility"). The Wells DIP Facility will be used to, among other things, provide the Debtors with adequate working capital and to cover any administrative obligations incurred during the course of the Chapter 11 Cases. The Wells DIP Facility is not new money. Rather, it represents a "roll-up" of the Senior Prepetition Credit Facility in exchange for the ability to continue to use the revolver and an increase in the availability thereunder.

33. Further, each of the Debtors has also entered into that certain DIP Credit and Security Agreement (the "Reser's DIP Facility Agreement," and together with the Wells DIP Facility Agreement, the "DIP Facility Agreements") with Reser's (together with the Wells Lenders, the "Postpetition Lenders") pursuant to which Reser's has agreed to provide postpetition financing up to the aggregate principal amount of $10 million (the "Reser's DIP Facility," and together with the Wells DIP Facility, the "DIP Facilities"). Consistent with the terms of that certain Subordination Agreement, dated as of the Petition Date (the "Subordination Agreement"), by and between Reser's, the Agent, and the Senior Prepetition Agent, all claims of and liens held by Reser's shall be subordinate to those of the Wells Lenders and the Senior Lenders.

34. Additionally, the Agent and Mistral Chef have entered into that certain Junior Participation Agreement (the "Junior Participation Agreement"), pursuant to which each Wells Lender has agreed to sell, and Mistral Chef has agreed to purchase, a junior participation interest in all of the rights and obligations of each Wells Lender under the Wells DIP Facility Agreement in an aggregate amount for all Wells Lenders equal to $3.3 million (the "Mistral Portion"). All liens and claims arising under the Mistral Portion of the Wells DIP Facility are subordinate to the claims and liens held by the Senior Prepetition Lenders, the Wells Lenders and Reser's.

## II.

## FIRST DAY PLEADINGS

35.     Concurrently with the filing of the Chapter 11 Cases, the Debtors will file a number of First Day Motions.  The Debtors anticipate that the Court will conduct a hearing soon after the commencement of the Debtors' chapter 11 cases, at which the Court will hear the First Day Motions.

36.     Generally, the First Day Motions have been designed to meet the goals of:  (a) continuing the Debtors' operations in chapter 11 with as little disruption and loss of productivity as possible; (b) maintaining the confidence and support of customers, employees and certain other key constituencies; and (c) establishing procedures for the smooth and efficient administration of these cases.  I have reviewed each of the First Day Motions, including the exhibits thereto and I believe that the relief sought in each of the First Day Motions is tailored to meet the goals described above and, ultimately, will be critical to the Debtors' ability to maximize the value of their assets for the benefit of all of the Debtors' economic stakeholders.

### *Debtors' Motion for Entry of an Order Directing Joint Administration of Their Chapter 11 Cases*

37.     The Debtors seek joint administration of the Chapter 11 Cases.  There are ten Debtors and Chef Solutions Holdings is the lead Debtor.

38.     The joint administration of the Debtors' cases will facilitate and promote an economically efficient administration of these cases, permit the Clerk of the Court to utilize a single general docket for these cases, and combine notices to creditors of the Debtors' respective estates and other parties in interest which will result in savings to the estates.

39.     If joint administration is ordered, the Debtors, the Court, creditors and other parties in interest will be able to avoid incurring considerable unnecessary time and expense in

connection with, among other things, the need to file duplicative motions, enter duplicative orders, and forward duplicative notices to creditors and other parties in interest.

40.     Joint administration will further enable parties in interest in these Chapter 11 Cases to be aware of the various matters before the Court in all of the Debtors' cases.

41.     To the best of my knowledge, the joint administration of these Chapter 11 Cases will not adversely affect the Debtors' respective constituencies and will not harm parties in interest.  Rather, all of these parties will benefit from the cost reductions associated with the joint administration of these cases.

42.     Consequently, I believe and submit that the joint administration of these Chapter 11 Cases is in the best interest of the Debtors, the Debtors' estates, their creditors and other parties in interest.

### *Debtors' Application to Retain Donlin, Recano & Company, Inc. as Claims Agent*

43.     The Debtors have thousands of creditors.  The sheer size and magnitude of the Debtors' creditor body would most likely make it impracticable for the Office of the Clerk of Court to undertake the tasks of noticing creditors and administering claims.

44.     I believe that the most effective and efficient manner of noticing creditors and parties in interest in these Chapter 11 Cases, and administering the claims process, is for the Debtors to engage an independent third party to act as the Debtors' notice, claims, and balloting agent.  The Debtors may also require the services of an agent to administer votes pursuant to any plan of reorganization or liquidation.  Accordingly, the Debtors propose to employ Donlin, Recano & Company, Inc. ("Donlin Recano") as the claims and noticing agent, inter alia, to assist the Debtors in distributing notices, as necessary, and to process other administrative information pertaining to these Chapter 11 Cases.

RLF1 5411080v. 1

45.    Donlin Recano specializes in noticing, claims processing, and other administrative tasks in chapter 11 cases.  Therefore, the Debtors wish to engage Donlin Recano to send out certain designated notices and to collect and monitor claims with respect to these Chapter 11 Cases.  The Debtors chose Donlin Recano based on both its experience and the competitiveness of its fees.  I believe that Donlin Recano is well-qualified to serve in this capacity and that Donlin Recano's retention is in the best interests of the Debtors' estates and their creditors.

***Debtors' Motion for Entry of Interim and Final Orders Determining Adequate Assurance of Payment for Future Utility Services***

46.    In the normal course of their business, the Debtors have relationships with certain utility providers (the "Utility Providers") for the provision of water, sewer service, electricity, natural gas, telephone service, internet service, waste management service and other services.

47.    In the event the Court approves the Debtors' requested use of cash collateral, the Debtors expect to have adequate funds to timely pay all postpetition obligations owed to their Utility Providers.

48.    To provide additional assurance of payment for future services to the Utility Providers, the Debtors will deposit $300,000 (the "Utility Deposit") into a newly created, segregated, interest-bearing account within 20 days of the Petition Date (the "Utility Deposit Account," and together with cash flow from operations, collectively, the "Proposed Adequate Assurance").  This amount represents a sum equal to 50% of the Debtors' estimated monthly cost of utility service.  The Utility Deposit Account shall be maintained with a minimum balance equal to 50% of the Debtors' estimated monthly cost of utility service, which may be adjusted by the Debtors to account for the termination of utility services by the Debtors and/or agreements with Utility Providers.

RLF1 5411080v. 1

49.     Notwithstanding the Proposed Adequate Assurance, if a Utility Provider is not satisfied that the establishment of the Utility Deposit Account provides adequate assurance of future payment, the Debtors propose the following procedures (the "Procedures") under which the Utility Provider may make additional requests for adequate assurance:

(a)     If a Utility Provider is not satisfied with the assurance of future payment provided by the Debtors, the Utility Provider must serve a written request upon the Debtors setting forth the location(s) at which the given utility services are provided, the account number(s) for such location(s), the outstanding balance for each account and a summary of the Debtors' payment history in each account (each, a "Request").

(b)     The Request must be served upon the following parties: (i) the Debtors, 120 W. Palatine Rd. Wheeling, IL 60090, Attn.: Susan Sarb; (ii) counsel to the Debtors, Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, DE 19801, Attn.: John H. Knight, Esq. and Zachary I. Shapiro, Esq; (iii) counsel to Mistral Capital Management, LLC, DLA Piper LLP (US), 1251 Avenue of the Americas, New York, NY 10020, Attn: Bennett S. Silverberg, Esq.; (iv) counsel to Wells Fargo Capital Finance, Inc., Schulte Roth & Zabel LLP, 919 Third Avenue, New York, NY 10022, Attn: Lawrence V. Gelber, Esq.; and (v) counsel to Reser's Fine Foods, Inc., Tonkon Torp LLP, 888 SW Fifth Avenue, Portland, OR 97204, Attn: Albert N. Kennedy, Esq. and Brownstein, Rask, Sweeney, Kerr, Grim, DeSylvia & Hay, LLP, 1200 SW Main Street, Portland OR 97205, Attn: Kirkham E. Hay, Esq.

(c)     Without further order of the Court, the Debtors may enter into agreements granting additional adequate assurance to a Utility Provider serving a timely Request if the Debtors in their discretion determine that the Request is reasonable or if the parties negotiate alternate consensual provisions.

(d)     If the Debtors are unable to consensually resolve a Request, the Debtors shall file a motion pursuant to section 366(c) of the Bankruptcy Code (a "Determination Motion") within thirty (30) days of receipt of a Request. The Determination Motion shall seek a determination from the Court that the Utility Deposit Account, plus any additional consideration offered by the Debtors, constitutes adequate assurance of payment. Pending notice and a hearing of the Determination Motion, the Utility Provider that is the subject of the Determination Motion may not alter, refuse or

discontinue services to the Debtors or recover or set off against a prepetition deposit.

    (e)    Any Utility Provider that fails to make a Request shall be deemed to be satisfied that the Debtors' Adequate Assurance provides adequate assurance of payment to such Utility Provider within the meaning of section 366 of the Bankruptcy Code.

50.    To the extent the Debtors subsequently identify additional providers of utilities, the Debtors seek authority, in their sole discretion, to amend the Utility Service List to add or remove any Utility Provider. Any subsequently added Utility Provider that objects to the Debtors' Adequate Assurance will be subject to the Procedures.

51.    The Debtors submit that the Utility Deposit Account provides more than adequate assurance of future payment. Subject to the Court's approval of the Debtors' requested use of cash collateral, the Debtors anticipate having sufficient resources to pay, and intend to pay, all valid postpetition obligations for utility services in a timely manner, especially considering that the aggregate amount of the Debtors' utility obligations is not overwhelming. In addition, the Debtors have a powerful incentive to stay current on their utility obligations because of their reliance on utility services for the operation of their business. These factors, which the Court may and should consider when determining the amount of any adequate assurance payments, justify a finding that the Debtors' Proposed Adequate Assurance is more than sufficient to assure the Utility Providers of future payment.

***Debtors' Motion for Entry of an Order Confirming the Administrative Expense Priority Status of the Debtors' Undisputed Obligations for the Postpetition Delivery of Goods and Services***

52.    In the ordinary course of the Debtors' business, numerous suppliers and service providers provide the Debtors with goods and services that are integral to the Debtors' business operations. As of the Petition Date, the Debtors had outstanding prepetition purchase orders

(collectively, the "Outstanding Orders") with certain suppliers (collectively, the "Suppliers") for such goods and services.

53.  The Debtors seek entry of an order confirming that the Debtors' undisputed obligations to the Suppliers under Outstanding Orders for (i) shipments of goods delivered to and accepted by the Debtors on and after the Petition Date and (ii) the provision of services to the Debtors on and after the Petition Date at the Debtors' request will be entitled to administrative expense priority status.

54.  As a result of the commencement of these Chapter 11 Cases, the Debtors believe that the Suppliers may perceive a risk that they will be treated as prepetition general unsecured creditors for the cost of any shipments made or services provided after the Petition Date pursuant to the Outstanding Orders.  As a result, the Suppliers may refuse to ship such goods to the Debtors or provide such services to the Debtors unless the Debtors issue substitute postpetition purchase orders or provide other assurances of payment.

55.  Issuing substitute purchase orders on a postpetition basis would be administratively burdensome, time-consuming, and counterproductive to the Debtors' continuing operations.  Such a requirement imposed by Suppliers – or other requests for assurance of payment – inevitably will lead to delays in the Debtors' receipt of goods and services.

56.  Under these circumstances, the Debtors believe that relief is needed to permit the Debtors to obtain the timely delivery of goods and uninterrupted provision of services from the Suppliers pursuant to the Outstanding Orders.

***Debtors' Motion for Entry of an Order Authorizing Payment of Certain Prepetition Common Carrier, Warehouse and Related Obligations (the "Common Carriers Motion")***

57.  The Debtors seek authority, pursuant to sections 105(a) and 363 of the Bankruptcy Code, to pay prepetition shipping, storage and associated fees and expenses to

certain common carriers, shippers, warehousemen, truckers, shipping auditing services, customs brokers and customs agents (collectively, the "Common Carriers") and local contractors and vendors that provide maintenance and repair services at the Debtors' facilities (collectively, the "Lien Claimants") that the Debtors determine, in the exercise of their business judgment, are necessary or appropriate to obtain the release of Goods in the possession of such parties and to satisfy the liens, if any, in respect of amounts owed to such parties.

58.     As of the Petition Date, the approximate value, at cost, of Goods ordered and either awaiting transit or in transit to or from the Debtors is $1,500,000.  In contrast, the Debtors estimate that the total amount owing to all Common Carriers and the Lien Claimants and the maximum amount required to obtain or deliver the Goods is approximately $750,000.

59.     If the Debtors do not pay the prepetition charges, the Common Carriers may refuse to ship Materials to the Debtors or Products to the Debtors' customers and the Lien Claimants may withhold necessary services, severely disrupting the Debtors' business.  Without the performance of services by the Common Carriers and the Lien Claimants, the Debtors face the risk of a serious interruption in the flow of necessary materials and distribution of finished products to their customers.

60.     The Debtors propose that any payments made pursuant to the Common Carrier Motion be subject to the following conditions:

(i)     The Debtors, in their sole discretion, shall determine which parties, if any, are entitled to payment under the Common Carriers Motion; and

(ii)    Prior to making a payment to a party under the Common Carriers Motion, the Debtors may, in their absolute discretion, settle all or some of the prepetition claims of such party for less than their face amount without further notice or hearing.

61.     In the ordinary course of their business, the Debtors employ the services of the Common Carriers to ship the Materials for their Products to them and the finished Products to

their customers. The shelf life for all of the Goods in transit immediately proceeding and on the Petition Date is approximately 21-days, with some Goods only having a shelf life of one week, and accordingly, timely receipt and delivery of the Goods is vital to the Debtors' ability to sustain their businesses.

62. Some of the Common Carriers have outstanding, or in the next few weeks will send, invoices for Goods delivered to the Debtors prior to the Petition Date (collectively, the "Goods Charges"). The Debtors believe that if they fail to pay these Goods Charges, the Common Carriers may discontinue or delay services and withhold or prevent shipment and sale of essential Goods. The Debtors seek authority to pay outstanding prepetition Goods Charges in an amount not to exceed $750,000 in the aggregate.

63. Additionally, in the ordinary course of their business, the Debtors employ the services of the Lien Claimants to provide maintenance and repairs services to the Debtors' properties. Some of the Lien Claimants have outstanding invoices for certain services provided to the Debtors' prior to the Petition Date, including roof repairs, refrigeration and piping maintenance and repairs, electrical maintenance and repairs and flooring replacement (collectively, the "Lien Charges," and together with the Goods Charges, the "Charges"). The Debtors believe that if they fail to pay these Lien Charges, the Lien Claimants may discontinue or delay essential services. The Debtors seek authority to pay outstanding prepetition Lien Charges in an amount not to exceed $270,000 in the aggregate.

64. The Debtors seek to pay the prepetition Charges for several reasons. First, if the prepetition Charges are not paid, the Common Carriers and the Lien Claimants may refuse to perform additional services for the Debtors. This would be detrimental with respect to the Goods in transit as of the Petition Date because they will likely spoil before they are released to the

Debtors or delivered to the Debtors' customers. Accordingly, the effects of delay or refusal to provide services would create more than a disruption, it would lead to a significant loss in value.

65.     Second such refusal to perform additional services for the Debtors could also lead premium shipping costs and the expenses of the Debtors seeking new common carriers to replace those that refuse to do business with the Debtors after the Petition Date. The Debtors reorganized their common carrier structure only months prior to the Petition Date, and accordingly, the Debtors believe that they have already streamlined their common carriers system as much as possible. Any disruption in the relationship with the current Common Carriers could only lead to significantly increased common carrier costs, both during the pendency of these Chapter 11 Cases and after the Debtors exit from bankruptcy.

66.     Third, any delays in payment of the Goods Charges with respect to Goods that are in the possession of the Common Carriers as of the Petition Date will likely result in the assertion, under applicable state law, of possessory liens upon the Debtors' property in the possession of such parties. As described above, the value of any Goods that the Common Carriers could assert a lien upon decreases on a daily basis due to the limited shelf life of the Goods. As such, even liens would not satisfy the Common Carriers' claims, and they would still hold claims in these Chapter 11 Cases. Similarly, any delays in payment of the Lien Charges will likely result in the assertion, under applicable state law, of materialmen's, mechanics', artisans', warehousemen's or other liens against the Debtors' property. Thus, the Debtors will have no alternative but to pay the Charges in order to effect the release of any liens securing payment of such charges.

67.     The Debtors seek authority to pay the prepetition claims of certain parties who supply goods or services critical to the continued operation of the Debtors' business (collectively, the "Critical Vendors").

68.     The Critical Vendors generally provide the ingredients required to create the Debtors' products, the goods needed to package the Debtors' product or sales services.

69.     In the ordinary course of their business, the Debtors purchase goods used to make their products from Critical Vendors that, due to a variety of factors, including, in some instances, the requirements of the Debtors' customers, are the only suppliers available to Debtors.  Theses goods are essential for the Debtors to continue to provide quality products with the level service their customers expect.

70.     The relief sought in the Critical Vendors Motion is essential to the Debtors' reorganization.  The Debtors operate in a highly competitive business sector.  The Debtors cannot afford any material disruptions of their business operations or present anything less than a "business as usual" appearance to the public.

71.     In some cases, literally no other vendor or supplier can supply such required goods.  In other cases, substitute goods from other potential vendors or suppliers may theoretically be available, but these alternate vendors or suppliers cannot provide goods that meet the Debtors' requirements for quality, quantity, or reliability, or cannot ensure availability on a cost-efficient and timely basis.  Further, to the extent that the agreements between the Debtors and their customers do not allow the Debtors to substitute suppliers, these relationships would be at risk if the Debtors were unable to continue their relationships with some of their Critical

Vendors. As a result, the Debtors cannot rely on these theoretical alternate sources to supply these essential goods.

72. Furthermore, if the Debtors are not granted the relief requested herein, the Debtors' stakeholders may question the Debtors' ability to maintain "business as usual" operations and relationships with their stakeholders during the duration of these Chapter 11 Cases. The Debtors' continued success depends on maintaining the confidence of their key stakeholder groups. Any loss of confidence among these stakeholders could jeopardize important and valuable employee, customer and vendor relationships and harm the Debtors' chapter 11 estates. Indeed, such harm to the Debtors' chapter 11 estates would affect the proposed sale of substantially all of the Debtors' assets. Under these circumstances, approval of the requested relief is appropriate and is necessary to avoid irreparable harm to the Debtors' estates.

73. Based on the foregoing, I believe that the relief requested is in the best interests of the Debtors and their respective estates and is necessary for the Debtors to continue to operate their businesses and therefore should be granted.

***Debtors' Motion for Entry of an Order (A) Authorizing Debtors to Continue Prepetition Insurance Coverage and (B) Authorizing and Directing Financial Institutions to Honor Related Checks and Electronic Payment Requests***

74. In the ordinary course of business, the Debtors maintain a number of insurance policies that provide coverage for, among other things, general liability, auto, workers' compensation, umbrella, international property, general property, product recall, crime (kidnap and ransom) and directors' and officers' (collectively, the "Policies"). Not only are some of these Policies required by various state and federal regulations, but further, section 1112 of the Bankruptcy Code provides that "failure to maintain appropriate insurance that poses a risk to the

estate or to the public" is "cause" for mandatory conversion or dismissal of a chapter 11 case. *See* 11 U.S.C. § 1112(b)(4)(C). A schedule of the current Policies, coverage amounts, terms and coverage dates is attached to the Insurance Motion as <u>Exhibit B</u> and is incorporated herein by reference (the "<u>Policy Schedule</u>").

75. The total annual premiums for the Policies in 2011 are approximately $1.2 million. It is not always economically advantageous for the Debtors to pay the premiums on all of the Policies on a lump-sum basis. Accordingly, in the ordinary course of the Debtors' business, the Debtors finance the payment of insurance premiums for some of their Policies (collectively, the "<u>Financed Policies</u>") pursuant to installment plans offered by some of the insurance carriers ("<u>Installment Plans</u>").

76. As of the Petition Date, payments totaling approximately $675,000 have been made against the total annual insurance premium cost of approximately $1.2 million, leaving an open amount of approximately $525,000 to be paid post-petition.

77. In light of the importance of maintaining insurance coverage and preserving the Debtors' liquidity by financing the insurance premiums, it is in the best interests of the Debtors' estates to authorize them to honor their obligations under the Installment Plans.

78. In the ordinary course of business, the Debtors engaged Plexus (the "<u>Broker</u>") to act as consultant and insurance broker in placing the Debtors' annual insurance program. The Debtors intend to continue their contacts with the Broker in the ordinary course of business.

79. In addition to the premium policies described above, the Debtors have a workers' compensation liability insurance policy for its Ohio workers which is partially self-funded as

required under Ohio law (the "Ohio Workers' Compensation Policy").[4] The Debtors believe that there are no amounts outstanding on account of claims arising under the Ohio Workers' Compensation Policy (the "Ohio Workers' Compensation Claims"). However, employees covered under the Ohio Workers' Compensation Policy may file claims based on injuries incurred prior to the Petition Date. To the extent the Debtors have liability under any such claims, the Debtors seek authority to pay those claims as they arise.

80. Further, prior to 2010, the Debtors' other workers' compensation polices were self-funded (the "Prior Workers' Compensation Policies," and together with the Ohio Workers' Compensation Policy, the "Workers' Compensation Policies"). While the Debtors' current workers' compensation policies, other than the Ohio Workers' Compensation Policy, are premium policies, the Debtors are liable for claims relating to the Prior Workers' Compensation Policies (the "Prior Workers' Compensation Claims," and together with the Ohio Workers' Compensation Claims, the "Workers' Compensation Claims"). As of the Petition Date, the Debtors estimate that the total outstanding liability for the Workers' Compensation Claims is approximately $325,000. In addition to the known Workers' Compensation Claims, the Debtors' believe that it is possible that other claims may arise related to injuries that occurred prior to the Petition Date. With respect to the Workers' Compensation Claims, if the Debtors fail to pay any such Workers' Compensation Claims, the Debtors' may be subject to significant penalties and fees and the Debtors' corporate officers may be held personally liable.

81. To maximize the value of the Debtors' estates, the Debtors must continue to operate the businesses as normal during these Chapter 11 Cases, with minimal disruptions and

---

[4] The Debtors owe approximately $90,000 in outstanding premium payments under the Ohio Workers' Compensation Policy. However, the $90,000 is included in the $525,000 to be paid post-petition as described above.

distractions. As described more fully in the Insurance Motion, it is essential to the Debtors' day-to-day-operations that they have authority to continue the Policies, including payment of any prepetition amounts owed under or in connection with the Policies. Therefore, the Debtors request authority to (a) continue insurance coverage entered into prepetition, including, without limitation, the Policies and (b) maintain the Financed Policies. The Debtors also seek authority to pay, in their discretion, up to $850,000 in prepetition amounts owing in respect of the Policies: $525,000 on account of premium payments and $325,000 in satisfaction of the Workers' Compensation Claims. The Debtors' also seek authority to satisfy any unknown Workers' Compensation Claims, and to modify the automatic stay so that employees injured both pre-petition and post-petition may file claims pursuant to the Workers' Compensation Policies.

82. The Debtors also request that financial institutions be authorized and directed to receive, process, honor and pay all checks presented for payment and electronic payment requests relating thereto, whether such checks were presented or electronic requests were submitted prior to or after the Petition Date. The Debtors further request that all financial institutions be authorized to rely on the Debtors' designation of any particular check or electronic payment request as appropriate pursuant to this Motion.

***Debtors' Motion for Order (A) Authorizing, but not Directing, Debtors to Pay Certain Prepetition (I) Wages, Salaries and Other Compensation, (II) Reimbursable Employee Expenses, and (III) Employee Medical and Similar Benefits; and (B) Authorizing and Directing Financial Institutions to Honor All Related Checks and Electronic Payment Requests* (the "Wages Motion")**

83. The Debtors' workforce consists of both hourly and salaried employees (the "Employees"). The Debtors pay approximately five hundred and seventy-eight (578) Employees on an hourly basis and pay approximately one hundred and twenty-nine (129) Employees on a salaried basis. Additionally, the Debtors utilize two (2) independent contractors in the ordinary course of business (the "Independent Contractors"). The Independent Contractors are critical to

the Debtors' management and operations. The Debtors employ one (1) part time Employee and seven hundred and seven (707) are full-time Employees. Approximately one hundred and forty-one (141) of the Employees are covered by a collective bargaining agreement, as described in further detail below.

84.     The Employees work at five (5) locations. The Debtors' locations are in Baxter Spring, Kansas (181 Employees), Wheeling, Illinois (66 Employees), Delphos, Ohio (264 Employees), Hidalgo Texas (3 Employees) and Vista, California (191 Employees).

85.     The Debtors also utilize two (2) Independent Contractors. One of the Independent Contractors is a maintenance engineer, providing assistance on a variety of projects at multiple debtor locations, including assistance with the Debtors' waste water system. The other Independent Contractor provides assistance with the "essbase" financial reporting program at the Debtors' corporate offices at Wheeling, Illinois. Each of the Independent Contractors are used by the Debtors in the ordinary course of business.

86.     In addition to the Employees and Independent Contractors, the Debtors also utilize temporary employees. All of the temporary employees other than some of those employed at the Delphos, Ohio location (the "Temp Agency Temporary Employees") are engaged through various temporary employment agencies (the "Temp Agencies") with which the Debtors contract. Some of the temporary employees employed at the Delphos, Ohio location (the "Delphos Temporary Employees") are not employed through Temp Agencies. Rather, the Debtors hire the Delphos Temporary Employees directly. The Debtors' pay the Delphos Temporary Employees through their payroll system, but they are not entitled to the medical or other benefits the Employees receive. Currently, there are forty-six (46) Delphos Temporary Employees.

### A.  Employee Obligations

#### (i)  Unpaid Compensation

87.     In the ordinary course of business, the Debtors pay the Employees and the Delphos Temporary Employees on a bi-weekly basis.  The Debtors' payroll obligations generally include wages and salaries, as applicable, as well as commissions and bonuses awarded for sales productivity and goal attainment.

88.     Automatic Data Processing, Inc. ("ADP") provides payroll administration services the Debtors.  On average, the Debtors have gross expenses relating to payroll administrative services and other services such as the Concur System and the Employee Assistance Plan, which are described in further detail in the Wages Motion, totaling $11,700 per month.  All such services are provided by ADP.  The Debtors estimate that, as of the Petition Date, approximately $33,000 is outstanding to ADP for providing these services during the prepetition period (the "ADP Expenses").

89.     Additionally, on average, the Debtors pay their Employees and the Delphos Temporary Employees approximately $2,600,000 per month.  Because the Debtors pay Employees and Delphos Temporary Employees in arrears, the Debtors estimate that approximately $1 million has accrued on account of wages, salaries, commissions and other compensation that the Employees and Delphos Temporary Employees earned prior to the Petition Date (the "Unpaid Compensation").

#### (ii)  Independent Contractor Compensation

90.     The Independent Contractors are compensated through the Debtors' accounts payable system.  Each Independent Contractor submits invoices to the Debtors, and they are paid from the Debtors' accounts payable account.  The Debtors estimate that approximately $22,000 is owed to the Independent Contractors for work completed prior to the Petition Date.  The total

amount due to one of the Independent Contractors is $7,000. Accordingly, this Independent Contractor does not hold a prepetition claim in excess of the $11,725 cap under section 507(a)(4) of the Bankruptcy Code. The Debtors seek authority, in their sole discretion, to honor the prepetition obligations to this Independent Contractor.

91.     The amount due to the other Independent Contractor, $15,000, does exceed the $11,725 cap under sections 507(a)(4) of the Bankruptcy Code by $3,250. The Debtors' need to maintain this Independent Contractor as his services assist the Debtors in their day to day operations and contribute to their ability to preserve the value of their estates. Therefore, pursuant to the Wages Motion, the Debtors seek authority, in their sole discretion, to continue to pay this Independent Contract up to $11,725 in the ordinary course of business on an interim basis, and authority to satisfy the additional $3,250 on a final basis.

### (iii)     Temp Agency Temporary Employees

92.     All of the Temp Agency Temporary Employees are compensated through the Temp Agencies. The Debtors make payments to the Temp Agencies on a weekly basis which, in turn, compensate the Temp Agency Temporary Employees for the services that they provided to the Debtors. Because the Debtors' needs with respect to Temp Agency Temporary Employees vary, the cost to the Debtors for Temp Agency Temporary Employees also differs from week to week. The Debtors estimate that they owe approximately $700,000 to the Temp Agencies for the services provided by the Temp Agency Temporary Employees prior to the Petition Date. No single Temp Agency Temporary Employee is entitled to more than $11,725 on account of work performed prior to the Petition Date.

### (iv)     Deductions and Withholdings

93.     During each applicable pay period, certain amounts are deducted from Employees' paychecks, including, without limitation, (a) garnishments, child support and similar

deductions, and (b) other pre- and after-tax deductions payable pursuant to certain of the employee benefit plans discussed herein (such as an Employee's share of health care benefits and insurance premiums, contributions under flexible spending plans, 401(k) contributions, legally ordered deductions, and miscellaneous deductions) (collectively, the "Non-Tax Deductions"). The Debtors effect these deductions in accordance with information provided by the Employees and forward the amount of the Non-Tax Deductions to the appropriate third-party recipients. On average, approximately $680,000 is deducted from Employees' paychecks per pay period, and certain of the Non-Tax Deductions may not have been included in the most recent pre-Petition Date funding on account of those obligations.

94.      Federal and state laws require the Debtors to withhold amounts related to federal, state and local income taxes, as well as Social Security and Medicare taxes, for remittance to the appropriate federal, state or local taxing authority (collectively, the "Withheld Amounts"). The Debtors must then provide additional amounts for federal and state unemployment insurance (the "Employer Payroll Taxes" and together with the Withheld Amounts, the "Payroll Taxes"). On average, the Payroll Taxes, including both the employee and employer portions, total approximately $330,000 per pay period.

**(v)      Honoring Checks for, and Payment of, Reimbursable Expenses**

95.      In the ordinary course of business, the Debtors reimburse Employees for certain expenses incurred in the scope of their employment and on behalf of the Debtors (the "Reimbursable Expenses"). On average, the Debtors reimburse Employees approximately $12,000 per week in the aggregate in Reimbursable Expenses such as business-related travel, entertainment and relocation costs (e.g., airfare, meal, hotel and rental car costs) with the expectation that they will be reimbursed. The Debtors currently owe approximately $30,000 on account of Reimbursable Expenses incurred prior to the Petition Date.

### (vi) Tuition Reimbursement Program

96.     The Debtors also employ a tuition reimbursement program (the "<u>Tuition Reimbursement Program</u>").  Pursuant to this program, the Debtors reimburse Employees for tuition incurred for authorized classes taken to further such Employees' ability to perform in their positions with the Debtors.  The Debtors do not reimburse tuition expenses until after the participating Employees have completed the relevant courses.  As of the Petition Date, two participating Employees were enrolled in classes, and will not complete such classes until the end of the current quarter.  Because the Debtors have satisfied all obligations under the Tuition Reimbursement Program relating to classes completed prior to the Petition Date, and no new obligations will accrue until the end of the current quarter, the Debtors believe that they do not have any outstanding obligations on account of the Tuition Reimbursement Program.  They anticipate that if both participating Employees complete the courses in which they are enrolled this quarter, the Debtors will owe approximately $7,800 on account of the Tuition Reimbursement Program.

### (vii) Prepetition Bonus Plans

#### (a) Attendance Bonus

97.     In the ordinary course of business, the Debtors employ an attendance bonus program (the "<u>Attendance Bonus</u>") available to members of the United Food and Commercial Workers International Union, District Local 2 (each a "<u>Baxter Springs Union Employee</u>," and collectively, the "<u>Baxter Springs Union Employees</u>"),[5] each of which is employed at the Baxter Springs, KS location.  The Attendance Bonus is payable semi-annually to each Baxter Springs Union Employee that meets certain attendance goals.  The approximate semi-annual cost to the

---

[5] Additional information relating to the Baxter Springs Union and the collective bargaining agreement between the Debtors and the Baxter Springs Union is set out below.

Debtors for the Attendance Bonus is $53,000. The last Attendance Bonus was paid in June, and the next Attendance Bonus will be due in December. Because the Attendance Bonus accrues when the relevant six month period ends, no outstanding prepetition amounts have accrued on account of this program.

(b)     *Sales Incentive Plan*

98.     The Debtors employ a sales incentive plan for their sales staff (the "Sales Incentive Plan"). Pursuant to the Sales Incentive Plan, when a member of the sales staff achieves certain semi-annual sales goals, such Employee receives a bonus equal to 30% of his or her salary. The Debtors estimate that as of the Petition Date, approximately $52,035 is due to seven (7) Employees on account of the Sales Incentive Plan.

99.     The total amounts that the Debtors owe to each of four (4) of the seven (7) Employees, when aggregated with the Unpaid Compensation and Reimbursable Expenses due to such Employees, do not exceed the $11,725 cap under section 507(a)(4) of the Bankruptcy Code. The total amount due on account of bonuses due under the Sales Incentive Plan to these four (4) Employees is $16,025. Pursuant to the Wages Motion, the Debtors seek authority, in their sole discretion to make payments not to exceed $16,025 to these four (4) Employees on account of the Sales Incentive Plan.

100.    The amounts due to the remaining three (3) Employees, when aggregated with their Unpaid Compensation and Reimbursable Expenses, however, do exceed the $11,725 cap under sections 507(a)(4) of the Bankruptcy Code. The total amount due on account of bonuses due under the Sales Incentive Plan to these three (3) Employees is $36,010. The aggregate

amount in excess of the cap on account of these three (3) Employees is $17,577.47[6] (the "Sales Incentive Plan Excess").  None of these three (3) Employees is an insider of the Debtors.  Given the minimal amounts in excess of the cap and the Debtors' need to maintain positive employee morale leading up to the sale of substantially all of their assets.  Therefore, pursuant to the Wages Motion, the Debtors seek authority, in their sole discretion, to continue to pay the Sales Incentive Plan bonuses to each of these Employees up to $11,725 per Employee in the ordinary course of business on an interim basis, a total of $18,432.53, and authority to pay the Sales Incentive Plan Excess of $17,577.47 on a final basis.

*(c)      Plant Performance Incentive Plan*

101.    At each of the Vista, California, Baxter Springs, Kansas and Delphos, Ohio locations, the Debtors have instituted plan performance incentive plans (the "Plant Performance Incentive Plans") which reward certain categories of salaried plant Employees for the achievement of financial and non-financial goals, including quality, safety and customer service. If any one or more of the plants achieve the established goals, the Debtors award bonuses to each eligible Employee of the achieving plant(s).  Achievement of goals is measured, and bonuses are awarded, on a semi-annual basis.  The Debtors estimate that approximately $48,000 is due and owing to forty (40) Employees on account of amounts earned through the Plant Performance Incentive Plans related to the period that ended on June 30, 2011.

102.    No Employee entitled to receive a bonus under the Plant Performance Incentive Plans holds a claim that is more than $11,725 when each Employee's bonus is aggregated with that Employee's Unpaid Compensation.

---

[6]  The three (3) Employees are entitled to $4,533.14, $4,323.31, and $8,728.02 in excess of the $11,725 cap, respectively.

*(d)*     *Miscellaneous Bonus*

103.     Further, one (1) Employee is entitled to payment related to a resolution of a dispute over whether that Employee was entitled to receive a bonus in 2010 (the "Miscellaneous Bonus").  The total amount that the Debtors owe this Employee on account of the Miscellaneous Bonus is $10,000, due in two payments of $5,000, one on October 7, 2011 and the other on November 4, 2011.   When this Miscellaneous Bonus is aggregated with the Unpaid Compensation due to this Employee, the total prepetition claim that this Employee has against the Debtors' estates is in excess of the section 507(a)(4) cap by approximately $3,409.61. Because the Debtors wish to honor obligations to Employees, and the amount in excess of the $11,725 cap is minimal with respect to the Miscellaneous Bonus.   Therefore, pursuant to the Wages Motion, the Debtors seek authority, in their sole discretion, to satisfy the obligations to this one (1) Employee up to $11,725 in the ordinary course of business on an interim basis, and authority to pay the additional $3,409.61 in excess of the section 507(a)(4) and 507(a)(5) cap on a final basis.

*(e)*     *Management Incentive Plan and Value-Creation Incentive Plan 2011*[7]

104.     In February 2011, the Debtors developed a management incentive plan (the "Management Incentive Plan"), pursuant to which certain members of the Debtors' management team could earn between 25% and 50%[8] of their base annual salary if the Debtors met certain financial goals during 2011.   The Management Incentive Plan further provided that if the financial goals were met in the first half of 2011, 33% of the total bonus amounts would be paid

---

[7]   As set out in further detail in the descriptions of the Management Incentive Plan and the Value Creation Incentive Plan for 2011 in the Wages Motion, the Debtors do not owe any amounts on account of these plans, and accordingly, do not require or seek court approval with respect to them.

[8]   The percentage that each Employee could earn is set out under the terms of the Management Incentive Plan.  Each Employee could earn either their specific designated percentage or nothing.

in July 2011. These goals were not met during the first half of 2011, and the Debtors believe, particularly giving the filing of these Chapter 11 Cases, that these financial goals will not be met during 2011. Accordingly, the Debtors have no outstanding obligations under the Management Incentive Plan and do not anticipate incurring any obligations during the pendency of these Chapter 11 Cases.

105. Also in February 2011, the Debtors instituted an incentive plan which proposed to award selected Employees for continuing employment with the Debtors through the sale of substantially all of the equity of the Debtors (the "Value-Creation Incentive Plan for 2011"). Under the terms of the Value-Creation Incentive Plan, the Debtors would have awarded bonuses based on the net enterprise value of the Debtors. Because the Debtors did not sell substantially all of their equity prior to the Petition Date, any bonuses under the Value-Creation Incentive Plan for 2011 have not accrued, and accordingly, there are no outstanding prepetition obligations relating to the Value-Creation Incentive Plan for 2011.

## B. Employee Benefits

106. The Debtors offer their Employees the opportunity to participate in the following benefit programs: health and wellness programs; employee savings and retirement plans; life, disability, and accidental death and dismemberment plans; flexible benefit plans; vacation, sick leave and other leaves of absence; employee assistance and counseling programs; and a health savings account program (collectively, the "Employee Benefit Programs").

### (i) Health and Wellness Plans

107. All full-time Employees are eligible to receive medical, dental, and vision benefits (the "Health Plans") the first of the month following ninety days of continuous employment. Under the Health Plans, the Debtors provide Employees with a medical plan (the "Medical Plan") administered through Blue Cross Blue Shield of Illinois (the "Medical

Administrator"). In addition, the Debtors provide Employees with a dental plan (the "Dental Plan") administered through Delta Dental ("Dental Administrator"). Finally, the Debtors provide Employees with a vision plan (the "Vision Plan") administered through VSP (the "Vision Administrator," and collectively with the Medical Administrator and the Dental Administrator, the "Health Plan Administrators"). Employees contribute 25% towards the cost of the Dental Plan and 100% to the Vision Plan. There is no Employee contribution to the Medical Plan for non-smokers. Employees that are smokers are required to contribute $25 per month to the Medical Plan. The Debtors withhold the Employees' pretax contribution from their earnings and the Debtors contribute the balance necessary to pay for the incurred claims and the administrative fees to the Health Plan Administrators.

108. Currently, the Debtors provide medical benefits to approximately four hundred and sixty (460) Employees under the Medical Plan. Moreover, the Medical Plan provide health care coverage to approximately six hundred and thirty-eight (638) dependents of Employees. Further, the Dental Plan provides dental coverage to approximately four hundred and twenty-five (425) Employees and six hundred and twenty (620) dependents of Employees. Finally, the Vision Plan provides vision coverage to approximately three hundred and seventy-one (371) Employees and five hundred and twenty-three (523) dependents of Employees.

109. The Debtors pay, on average, approximately $30,000 per month to the Medical Administrator for administration of the Medical Plan and approximately $1,500 per month to the Dental Administrator for administration of the Dental Plan. The Debtors estimate that as of the Petition Date, approximately $70,000 is due an outstanding to the Medical Administrator and $1,500 outstanding to the Dental Administrator on account of administration fees related to the Medical Plan and the Dental Plan. Further, the Medical Plan and the Dental Plan are self

insured, and as such, the Debtors pay, on average, approximately $150,000 per month on account of claims filed by Employees under the Medical Plan and approximately $16,000 per month on account of claims filed by Employees under the Dental Plan. As of the Petition Date, the Debtors estimate that approximately $620,000 is outstanding on account of claims filed pursuant to the Medical Plan and $14,000 is outstanding on account of claims filed pursuant to the Dental Plan.

110. Further, consistent with federal law, the Debtors offer a Cobra plan (the "Cobra Plan") to terminated Employees. Former Employees that elect to participate in the Cobra Plan may do so by affirmatively registering for the Cobra Plan. Former Employees may participate in the Cobra Plan for up to thirty-six (36) months following their termination, although most former Employees are only eligible to participate for up to eighteen (18) months. Such participation is at the terminated Employees' sole cost and exclusive expense. The former Employees that participate in the Cobra Plan pay any incurred expenses to the Debtors who forward such amounts to the appropriate Health Plan Administrators. While the Debtors temporarily have possession of such amounts, they are not property of the estate.

### (ii) Employee Savings and Retirement Plans

111. *401(k)/Retirement Plans.* The Debtors maintain a capital accumulation plan meeting the requirements of section 401(k) of the Internal Revenue Code for the benefit of all eligible Employees (the "401(k) Plan"). The 401(k) Plan is administered through Diversified Investment Advisors. Employees are eligible to contribute to the 401(k) Plan immediately upon hire, and they can contribute up to 25% of their compensation on a pretax basis, subject to regulations set by the Internal Revenue Service. Further, individuals over 50 years of age, may contribute additional, catch-up amounts, up to $5,500 per year. The Debtors do not match the contributions made by the Employees. Approximately eight hundred and twenty-four (824)

active Employees, in addition to approximately eight hundred and seventy-five (875) former Employees, currently participate in the 401(k) Plan. The approximate amount withheld from Employees' paychecks for 401(k) contributions is $31,000 per month. An additional $6,600 is withheld from Employees' paychecks for loan repayments.

### (iii)     Insurance and Flexible Benefit Plans

112.     The Debtors provide each full-time Employee, effective the first of the month following ninety-days of continuous employment, with group life insurance coverage through Dearborn National (the "Life Insurance Plan"). The Debtors fully fund this plan and no Employee contribution is required. Under the Life Insurance Plan, the Debtors provide eligible Employees with coverage in the amount of twice their base annual salary. Coverage is automatic for eligible employees and no enrollment is required. The cost of the Life Insurance Plan is combined with that of that AD&D Coverage (as defined below). Accordingly, the average monthly amounts and amounts outstanding as of the Petition Date are discussed below with the AD&D Coverage.

113.     Additionally, the Debtors offer each Employee the option to purchase supplemental life insurance at the Employee's own and exclusive expense (the "Supplemental Term Life Insurance") through Dearborn National. Employees may elect to purchase Supplemental Term Life Insurance, at their own expense, in base salary increments, up to three additional times the respective Employee's annual salary. Employees can also elect to purchase additional life insurance for their spouses for either $25,000 or one times the Employee's salary. Further, Employees can elect to purchase additional life insurance for their child(ren) in amounts of $5,000 per child or $500 per infant. The Debtors withhold the costs associated with the Supplemental Term Life Insurance from each Employee's earnings and remit these amounts to Dearborn National.

114.     The  Debtors  also  provide  their  Employees  with  accidental  death  and dismemberment coverage (the "AD&D Coverage") through Dearborn National.  The Debtors fully fund this plan and no Employee contribution is required.  Coverage is automatic for eligible Employees  with  coverage  in  the  amount  of  two  times  their  annual  base  salary  for  salaried Employees and one time their annual base salary for hourly Employees.  As described above, the cost for the AD&D Coverage is combined with the cost of the Life Insurance Plan.  On average, the AD&D Coverage and the Life Insurance Plan costs the Debtors approximately $13,200 per month.  The Debtors estimate that, as of the Petition Date, approximately $34,000 is outstanding in incurred but unpaid premium expenses related to the AD&D Coverage and the Life Insurance Plan for the prepetition period.

115.     The  Debtors  offer  each  Employee  the  opportunity  to  purchase  supplemental accidental  death  and  dismemberment  coverage  ("Supplemental  AD&D  Coverage")  at  the Employee's  own  and  exclusive  expense.    Employees  may  elect  to  purchase  Supplemental AD&D  Coverage  in  base  salary  increments,  up  to  an  additional  three  times  the  respective Employee's annual salary.  The Debtors withhold the costs associated with the Supplemental AD&D Coverage from each Employee's earnings and remit these amounts to Dearborn National.

116.     In  addition,  the  Debtors  provide  Employees  with  short-term  and  long-term disability coverage (respectively, the "ST Disability Benefits Program" and the "LT Disability Benefits Program").  The ST Disability Benefits Program is administered by Dearborn National and provided to all Employees.  This coverage is effective on the first day of active employment, and  coverage  is  automatic  for  eligible  Employees  and  no  enrollment  is  required.    The  ST Disability Benefits Program provides coverage equal to 60% of an eligible Employees' pre-injury  earnings,  and  Employees  can  elect  to  buy-up  the  ST  Disability  Benefits  cover  an

additional 20% of their pre-injury earnings. The ST Disability Benefits Program pays up to twenty-six (26) weeks of disability. The ST Disability Benefits Program is a self-funded plan. The Debtors forward any amounts owed on account of this program to Dearborn National which withholds any taxes from the amounts owed to the disabled Employees and issues checks directly to such disabled Employees. On average, the claims under the ST Disability Benefits Program are approximately $6,200 per month. As of the petition date, there was approximately $45,000 outstanding on account of claims filed under the ST Disability Benefits Program. Additionally, on average, the Debtors incur $1,000 per month in administrative fees to Dearborn National. As of the Petition Date, the Debtors estimate that they owe approximately $1,000 on account of prepetition obligations relating to the administration of the ST Disability Benefits Program.

117. The Debtors provide a LT Disability Benefits Program to all salaried Employees through a plan administered by Unum. The LT Disability Benefits Program provides coverage for salaried Employees equal to 60% of such salaried Employees' pre-injury earnings. On average, providing the LT Disability Benefits Program to the Debtors' salaried Employees costs the Debtors approximately $3,400 per month in premium costs. As of the Petition Date, approximately $6,000 was outstanding on account of premiums relating to the LT Disability Benefits Program.

118. The Debtors further provide hourly Employees the option to purchase long term disability benefits through Dearborn National. Employees may elect to purchase such benefits at their own and exclusive expense. The Debtors withhold the costs associated with the hourly Employees' long term disability benefits each participating hourly Employee's earnings and remit these amounts to Dearborn National. All salaried Employees and each participating hourly

Employee begin to receive long term disability benefits, either through the LT Disability Benefits Program or through the plan administered by Dearborn National, starting in the twenty-seventh week of such Employee's disability. Long-term disability benefits are offset by other income such as social security and workers compensation.

119.    Finally, the Debtors offer certain eligible Employees the ability to contribute a portion of their pretax compensation to flexible spending accounts to pay for eligible out-of-pocket dependent care premiums and expenses (the "Flexible Benefit Plan"). Currently, approximately nine (9) Employees participate in the Flexible Benefit Plan.

**(iv)    Collective Bargaining Agreement**

120.    Approximately one hundred and thirty-nine (139) of the Debtors' Employees are represented by the United Food and Commercial Workers International Union, District Local 2 (the "Baxter Springs Union"). The Baxter Springs Union is a party to a collective bargaining agreement with the Debtors (the "CBA") which establishes standards for, among other things, wages, overtime, vacation, sick leave, and certain other benefits. Except as described above, Employees covered by the CBA are included in the description of the Unpaid Compensation and the Health and Wellness Plans set forth above. There are no additional expenses associated with the Debtors obligations under the CBA.

**(v)    Vacation, Sick Leave and Other Leaves of Absence**

121.    The Debtors provide paid vacation time ("Vacation Time") to full-time Employees. Vacation Time accrues based on a particular Employee's length of service as set forth below.

122.    All full-time Employees are entitled to Vacation Time. Employees begin accruing Vacation Time on their official start date. The amount of Vacation Time that is allocated to an Employee can only be used throughout the year in which it is earned. All non-

union Employees' vacation accrues and must be used within calendar years while the Baxter Springs Union Employees' vacation accrues and must be used within a year commencing on such Baxter Springs Union Employees' anniversary. Except as set out below, any earned but unused time is forfeited. The details regarding the amount of Vacation Time Employees can earned based on their years of service are set out in schedules in the Wages Motion.

123.     Each Baxter Springs Union Employee who has earned, and is eligible for three or more weeks of vacation is allowed to exercise a "sell back" option for their third week and any additional weeks such Baxter Springs Union Employees may have. Accordingly, such Baxter Springs Union Employees that exercise this option receive one or more weeks worth of vacation pursuant to a cash pay out rather than taking time off.

124.     Further, prior to the Petition Date, the Debtors have provided pay outs of earned but unused vacation time to all Employees upon their termination from the Debtors' employ.

125.     Certain Employees were employed at some of the Debtors' locations prior to the Debtors' acquisition of such locations. Under their previous employers' policy, such Employees did not forfeit unused vacation time, but rather were able to accumulate it and receive cash payouts for such unused time upon their termination. When the Debtors acquired these locations, they allowed these Employees to retain any such accumulated vacation time, but all subsequently accrued vacation time has been and is forfeited if unused consistent with the company policy. Accordingly, the Debtors will have certain obligations relating to these earned, but unused vacation time if such Employees are terminated following the Petition Date.

126.     Additionally, each hourly Employee is entitled to 3 sick days per calendar year. Prior to the Petition Date, the Debtors typically paid out any unused sick days at the end of the

45

year. Because this obligation does not accrue until the end of the calendar year, there are no outstanding prepetition amounts on account of this program.

127. The Debtors also allow their Employees to take certain other leaves of absence for personal reasons, many of which are required by law (the "Leaves of Absence"). Leaves of Absence include family medical leave, family care leave, pregnancy disability leave, bereavement leave and military leave.

128. The Debtors anticipate that their Employees will utilize accrued Vacation Time and Leaves of Absence in the ordinary course of business, which will not create any material cash flow requirements beyond the Debtors' normal, ordinary course payroll obligations, and seek authority to honor such accrued benefits.

### (vi) Additional Employee Benefits

129. The Debtors provide an employee assistance plan (the "Employee Assistance Plan") which provides assistance to all Employees, by telephone, with any work life issues they may be experiencing. This support counseling program is fully funded by the Debtors and is provided by Magellan Behavioral Health, Inc. The total monthly cost for this program is approximately $1,300, which is paid on a quarterly basis. As of the Petition Date, the Debtors estimate that approximately $8,000 is outstanding to Magellan Behavioral Health, Inc. on account of the Employee Assistance Plan.

130. The Debtors also provide all Employees with the option to participate in a health savings account program (the "Health Savings Account Program"). Pursuant to the Health Savings Account Program, amounts are withheld from each participating Employee's compensation and deposited into their respective account on a monthly basis. The amounts in the health savings accounts are used to pay for participating Employees' personal and family medical expenses. The Debtors provide matching amounts for all non-union Employees that

46

earn up to $65,000 per year. For individuals making less than $35,000 per year, the Debtors match up to $500 per year. For individuals making between $35,000 and $65,000 per year, the Debtors match up to $250 per year. For Employees making less than $35,000 that participate in the family Health Savings Account Program, the Debtors match up to $1,000 per year. Finally, for Employees making between $35,000 and $65,000 per year that participate in the family Health Savings Account Program, the Debtors match up to $500 per year. The Debtors estimate that the average monthly cost for administering the Health Savings Account Program is approximately $750. Further, the average monthly cost attributable to matching obligations related to the Heath Savings Account Program is $1,000. The Debtors believe that the outstanding prepetition costs related to administering and matching are approximately $2,600 and accordingly, seek authority to remit payments in this amount. Further, the Debtors withhold the amounts deposited in the health savings accounts from each participating Employee's earnings and remit these amounts into the health savings accounts.

131. Additionally, the Debtors provide a hotline for the Employees to confidentially report work-related issues such as harassment, suspicions of theft by other Employees and safety concerns. This hotline is administered by the Network and costs of administering this program are prepaid annually for each November through October. The invoice for November 2011 through October 2012 for $3,500 came due prior to the Petition Date.

132. Finally, the Debtors provide a vehicle allowance to nine (9) of their Employees (the "Vehicle Allowance"). The average expense to the Debtors on account of the Vehicle Allowance is approximately $3,250 per pay period. As of the Petition Date, the Debtors estimate that approximately $3,250 is outstanding on account of the Vehicle Allowance. The Debtors

seek authority, in their sole discretion to honor this obligation and continue this program in the ordinary course of business

### Debtors' Motion For Entry Of An Order Authorizing The Debtors To Honor Certain Prepetition Customer Programs

133.    Prior to commencement of these Chapter 11 Cases, both in the ordinary course of their business and as is customary in their industry, the Debtors engaged in certain activities to develop and sustain a positive reputation with the customers to whom the Debtors market their products.  To that end, the Debtors implemented various customer programs and policies (collectively, the "Customer Programs") designed to ensure customer satisfaction, drive sales, meet competitive pressures, develop and sustain customer loyalty, improve profitability and generate goodwill for the Debtors and their products, thereby retaining current customers, attracting new ones and ultimately enhancing net income.  The Debtors seek authority to continue the Customer Programs in the ordinary course of business.

134.    The benefits of the Customer Programs are integral to the Debtors' efforts to maximize the value of their business as a going concern and ultimately deliver the most value to all stakeholders in these Chapter 11 Cases.  The Debtors believe they must quickly assure customers of the Debtors' continued ability to fulfill their obligations under the prepetition Customer Programs in order to maintain their valuable customer relationships following the commencement of these Chapter 11 Cases, particularly given the increased pressure from competitors that the Debtors believe will inevitably arise.  General descriptions of the Debtors' Customer Programs are set forth below.

135.    Rebates.  The Debtors provide rebates to various customers based on negotiations and pricing structures between the parties (collectively, the "Rebates").  The Debtors and the customers negotiate the term of the Rebates.  A typical term is one year.  The Debtors issue the

Rebates either as a discount of the price of a customer's order or as a check for the amount of the Rebate. As of the Petition Date, the Debtors owe approximately $800,000 to their customers for those Rebates that the Debtors issue by check.

136.    If the Debtors were not able to honor their Rebates, the Debtors' goodwill would be harmed and their business operations would suffer. The importance of the Rebates to the Debtors' market competitiveness makes it critical that the Debtors be authorized, but not directed, in the ordinary course of their business and in the exercise of their business judgment, to both honor their prepetition Rebates and to continue to offer rebate programs going forward in connection with sales and provision of services.

137.    <u>Warranties</u>. The Debtors provide a general warranty in connection with the sale of their products (collectively, the "<u>Warranties</u>"). The Debtors' products are specialized and usually manufactured or designed to exact specifications for the Debtors' various customers. As such, the Debtors will generally deliver completed products to its customers who will, in turn, test those products to ensure that they meet the specifications required by that given customer for the product in question. In the event that the products delivered by the Debtors exhibit any defects in quality or safety, the Debtors may, at the customer's option (i) replace the defective product, (ii) replace the defective product at Debtors expense and deliver to customer, or (iii) refund the purchase price of the defected product.

138.    If the Debtors were not able to honor their Warranties, the Debtors' goodwill would be harmed and their business operations would suffer. The importance of the Warranties to the Debtors' market competitiveness makes it critical that the Debtors be authorized, but not directed, in the ordinary course of their business and in the exercise of their business judgment,

to both honor their prepetition Warranties and to continue to offer warranty programs going forward in connection with sales and provision of services.

139. Therefore, the Debtors seek authority to pay, in their discretion, up to $800,000 in Rebates and to otherwise continue their Customer Programs and to honor their undisputed prepetition obligations in respect thereof in the ordinary course of business without interruption in accordance with prepetition practices.

***Debtors' Motion For Entry Of An Order Pursuant To Sections 105(a) And 363(b) Of The Bankruptcy Code For Authorization To Pay Prepetition Taxes And Other Charges***

140. In the ordinary course of business, the Debtors incur tax liability, including, but not limited to, use, franchise, commercial activity, property and other taxes and fees necessary to operate their businesses (collectively, the "Taxes and Fees") on behalf of various U.S. taxing and licensing authorities (collectively, the "Taxing Authorities").[9] The Debtors pay the Taxes and Fees monthly, quarterly or annually to the respective Taxing Authorities, in each case as required by applicable laws and regulations. The Debtors seek authority to pay prepetition Taxes and Fees, to the respective Taxing Authorities in the ordinary course of the Debtors' business.

141. The Debtors seek the relief requested in the event and to the extent that any Taxes and Fees accrued prepetition have not been paid or processed prepetition, or were paid in an amount that was less than is actually owed, or in the event that any payments made prepetition were rejected, lost or otherwise not received in full by any Taxing Authorities. Further, there may be taxes incurred or collected from sales and services provided prepetition that will come due shortly after the Petition Date. General descriptions of the Taxes and Fees are set forth below.

---

[9] The Debtors have a taxable presence in California, Illinois, Kansas, Missouri, New Jersey, Ohio, Texas, and Washington.

142.     Use Taxes.  In the normal course of business, the Debtors incur use taxes (the "Use Taxes").  The Debtors' liability for use tax arises from:  (i) purchase of fixed assets without sales tax or (ii) purchase of supplies without sales tax.  Purchases without sales tax occur when property or services are purchased from vendors that have no nexus to the resident state of the Debtors and such vendors have no obligation to charge or remit sales Taxes for sales to parties outside the state of the vendor's operations.  Nevertheless, purchasers, such as the Debtors, are obligated to self-assess and pay Use Taxes, when applicable, to the state in which the Debtors are the "end user" of the goods or services provided by the vendor with no nexus to that state.  The Debtors traditionally remit Taxes through an automatic clearing house ("ACH") system or by mailing checks.

143.     As of the Petition Date, the Debtors estimate that approximately $30,000 in Use Taxes relating to the prepetition period will become due and owing to the Taxing Authorities in the ordinary course of business.

144.     Franchise and Commercial Activity Taxes.  In the ordinary course of business, the Debtors pay franchise or commercial activity taxes to certain of the Taxing Authorities, thus authorizing the Debtors to operate their businesses in the applicable taxing jurisdiction (collectively, the "Franchise Taxes").  Some states assess a flat Franchise Tax on all businesses, while other states assess a Franchise Tax based upon some measure of income, gross receipts, net worth or other measure of value.  Certain states impose personal liability on the directors, officers and employees of a corporation if that corporation fails to pay Franchise Taxes. Additionally, the Debtors' failure to pay Franchise Taxes could cause some states to challenge the Debtors' right to operate within their jurisdiction.  Addressing any subsequent action taken

by those states would be costly, place an administrative burden on management, and divert management's attention from the Chapter 11 Cases.

145.     As of the Petition Date, the Debtors estimate that approximately $61,000 in Franchise Taxes relating to the prepetition period will become due and owing to the Taxing Authorities in the ordinary course of business.

146.     <u>Property Taxes</u>.  In addition, the Debtors pay personal and real property taxes to certain of the Taxing Authorities (the "<u>Property Taxes</u>"), thus authorizing the Debtors to operate their businesses in the applicable taxing jurisdiction.  The Debtors estimate that they owe approximately $519,000[10] in such Property Taxes to certain of the Taxing Authorities for the period prior to and including the Petition Date.

147.     The Debtors estimate that the total amount of prepetition Taxes and Fees owing to the various Taxing Authorities will not exceed $610,000.  Any amounts that are actually due, but have not yet been paid to the Taxing Authorities because of the commencement of these Chapter 11 Cases, represent a small fraction of the Debtors' total assets.  If the Debtors do not pay such amounts in a timely manner, the Taxing Authorities may attempt to suspend the Debtors' operations, file liens, seek to lift the automatic stay, and pursue other remedies that will harm the estates.  Additionally, some, if not all, of the Taxing Authorities may initiate an audit of the Debtors if the Taxes and Fees are not paid immediately.  Such audits will unnecessarily divert the Debtors' attention away from the Chapter 11 Cases.

148.     In all cases, the Debtors' failure to pay the Taxes and Fees could have a material adverse impact on their ability to operate in the ordinary course of business.  Any disputes with Taxing Authorities that could impact their ability to conduct business in a particular jurisdiction

---

[10] Approximately $232,000 of that amount is for Property Taxes allegedly owed to Illinois.  However, that amount is currently in dispute.

could have a wide-ranging and adverse effect on the Debtors' operations as a whole. Therefore, the Debtors seek entry of an order authorizing but not directing them to pay all Taxes and Fees to the Taxing Authorities, including those tax obligations subsequently determined upon audit to be owed for periods prior to the Petition Date.

***Debtors' Motion For Entry Of An Order Pursuant To Bankruptcy Code Section 105(A) Authorizing Payment Of Claims Asserted Under The Perishable Agricultural Commodities Act***

149.    The Debtors seek entry of an order authorizing them to timely and fully pay all valid claims (the "PACA Claims") under the Perishable Agricultural Commodities Act of 1930 ("PACA") to the vendors of produce and other goods protected under this federal statute (the "PACA Vendors") in the ordinary course of business and consistent with Debtors' historical practices.

150.    In the ordinary course of business, the Debtors purchase goods covered under PACA (the "PACA Goods"), primarily in the form of fresh fruits and vegetables which they manufacture into prepared foods such as salads, side dishes, sauces, spreads, dips, fresh-cut fruit and flash frozen vegetables which they sell to leading retailers such as Wal-Mart, Costco, Trader Joe's, Bob Evans and Ruby Tuesday. The Debtors estimate that annually they purchase approximately $26 million of perishable agricultural commodities. Accordingly, the Debtors constitute "dealers" under PACA and are therefore subject to its requirements because they purchase PACA Goods in wholesale quantities in excess of $230,000 annually. *See* 7 U.S.C. § 499a(b)(6)(B). The Debtors estimate that, as of the Petition Date, they owe PACA Vendors approximately $3.7 million in PACA Claims.

151.    The PACA Goods are a critical component of the Debtors' business and the Debtors anticipate that a significant number of PACA Vendors may file PACA notices to reserve

their rights to the assets (the "PACA Trust Assets") in the PACA trust (the "PACA Trust"). *See* 7 U.S.C. § 499e(c)(2)-(4). In order to avoid disruption to the Debtors' business, it is essential that the Debtors be able to continue to pay these claims in the ordinary course of business, as required by PACA. While nothing in the PACA Motion constitutes an admission by the Debtors that they are subject to PACA or that the claims asserted by PACA Vendors are entitled to protection under the statute, out of an abundance of caution and to preserve the going concern value of the Debtors and avoid disruption in supplies of fresh produce, which are critical to the Debtors' business, the Debtors seek authority to pay potential PACA Claims in the ordinary course of business.

152. Failure to maintain the PACA Trust and make full payment promptly to trust beneficiaries is unlawful. *See, e.g.,* 7 U.S.C. § 499b(4). Accordingly, the Debtors submit that the timely and full payment of valid PACA Claims in the ordinary course of business and consistent with their historical practices should be authorized pursuant to section 105(a) of the Bankruptcy Code. Furthermore, payment of valid PACA Claims will inure to the benefit of the Debtors' estates because it will foster continued relationships between the Debtors and the PACA Vendors. These relationships are essential to the Debtors' ability to service their customers and to the efficient, uninterrupted operation of their businesses. Absent the relief requested herein, the Debtors could be subjected to a substantial number of unnecessary claims and adversary proceedings, including motions for relief from the automatic stay, asserted or initiated by PACA Vendors, which would result in an unwarranted expenditure of time, effort, and money by the Debtors, and disrupt critical supplies of fresh produce. The Debtors' survival depends, in large part, on their ability to procure deliveries of perishable goods protected by PACA. Any delays – perceived or real – in satisfying amounts owed to PACA Vendors could

adversely affect the Debtors' ability to obtain fresh produce, thereby undercutting the Debtors' reorganization and sale prospects.

153.    Also, as set forth more fully in the PACA Motion, PACA Vendors would, in any event, be entitled to payment from the applicable statutory trust ahead of the Debtors' other creditors and outside of any plan or reorganization.  Thus, payment of the PACA Claims will not prejudice the Debtors' other creditors.  The amounts necessary to continue paying PACA Vendors consistent with historical practices are also included in the Debtors' post-petition financing budget and will not impair, and in fact should enhance, Debtors' ability to fund ongoing operations through the conclusion of their sale process.

154.    Finally, certain courts have held that officers and directors may be held secondarily liable for amounts owed to sellers under PACA.  *See, e.g., Weis-Buy Services, Inc. v Paglia*, 411 F.3d 415 (3d Cir. 2005).  Thus, to the extent the Debtors' obligations under PACA are not promptly satisfied, their officers and directors may be subject to lawsuits during the pendency of these Chapter 11 Cases.  Any such litigation (and ensuing potential liability) would distract the efforts of the Debtors and their officers and directors to implement a successful reorganization strategy, to the detriment of all stakeholders.  Accordingly, the relief requested is essential, appropriate, and in the best interests of the Debtors and their estates and creditors.

***Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(d)(1), and 364(e); and (B) Use Cash Collateral Pursuant to 11 U.S.C. § 363; (II) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361, 362, 363 and 364; and (III) Scheduling Final Hearing Pursuant to Bankruptcy Rule 4001(b)*(the "Financing Motion")***[11]

155.    Pursuant to the Financing Motion, the Debtors are seeking entry of an interim order with respect to the Wells DIP Facility, an interim order with respect to the Reser's DIP

---

[11]  Capitalized terms used but not otherwise defined in this description shall have the meanings ascribed to them in the Financing Motion.

Facility, a final order with respect to the Wells DIP Facility (the "Wells Final DIP Order") and a final order with respect to the Reser's DIP Facility (the "Reser's Final DIP Order," and together with the Wells Final DIP Order, the "Final Orders," and collectively with the Interim Orders, the "DIP Orders") authorizing the Debtors to, among other things: (i) obtain post-petition financing pursuant to sections 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e) of the Bankruptcy Code (a) in the amount of up to $28,000,000 by entering into the Wells DIP Facility Agreement; (b) in the amount of up to $10,000,000 by entering into the Reser's DIP Facility Agreement; (ii) use Cash Collateral pursuant to section 363 of the Bankruptcy Code; (iii) grant to the Agent (on behalf of the Wells Lenders) first priority security interests in and liens on, all of the DIP Collateral to secure the Wells DIP Facility and all of the obligations owed under the loan documents under the Wells DIP Facility (the "Wells Obligations"); (iv) grant to Reser's security interests in, and liens on, all of the DIP Collateral and the Reser's DIP Account with priority over all liens and security interests, except the liens and security interests that secure the Wells DIP Facility and the Wells Obligations, to secure the Reser's DIP Facility and the obligations owed under the loan documents under the Reser's DIP Facility (the "Reser's Obligations"); (v) grant allowed superpriority administrative expense claims to the Lenders; (vi) grant adequate protection to the Senior Prepetition Agent, in its capacity as agent for the Senior Prepetition Lenders under the Prepetition Senior Loan Agreement, in respect of any diminution in value of the assets securing the Senior Prepetition Credit Facility, the incurrence of Wells Obligations, the use of Cash Collateral and the granting of the Wells Lenders' Liens; (vii) grant adequate protection to Mistral Chef in respect of any diminution in value of the assets securing the loan extended pursuant to the Prepetition Note Purchase Agreement and Mistral Chef's consent to the incurrence of the Wells Obligations and Reser's Obligations; (viii) repay the Senior Prepetition

Credit Facility pursuant to the terms of the Prepetition Senior Loan Agreement and the Wells Interim DIP Order; and (ix) schedule a hearing, pursuant to Rule 4001(c)(2) of the Bankruptcy Rules, to consider the Final Orders.

156. Pursuant to the Wells DIP Facility Agreement, the Wells Lenders have agreed to provide postpetition financing up to the aggregate principal amount of $28,000,000. The Wells DIP Facility will be used to, among other things, provide the Debtors with adequate working capital and to cover any administrative obligations incurred during the course of the Chapter 11 Cases. The Wells DIP Facility is not new money. Rather, it represents a roll-up of the Senior Prepetition Credit Facility in exchange for the ability to continue to use the revolver and an increase in the availability thereunder.

157. Pursuant to Reser's DIP Facility Agreement, Reser's has agreed to provide postpetition financing up to the aggregate principal amount of $10,000,000. Consistent with the terms of the Subordination Agreement, all claims of and liens held by Reser's shall be subordinate to those of the Wells Lenders.

158. Additionally, pursuant to the Junior Participation Agreement, each Wells Lender has agreed to sell, and Mistral Chef has agreed to purchase, a junior participation interest in all of the rights and obligations of each Wells Lender under the Wells DIP Facility Agreement in an aggregate amount for all Wells Lenders equal to $3,300,000. All liens and claims arising under the Mistral Portion of the Wells DIP Facility are subordinate to the claims and liens held by the Senior Prepetition Lenders, the Wells Lenders and Reser's.

A. **Negotiations and Need for Post-Petition Financing**

159. As demonstrated by the Budget, the Debtors do not have sufficient available sources of working capital, including cash collateral, to operate in the ordinary course of business without the financing requested in this Motion. The Debtors' ability to maintain

business relationships with their vendors, suppliers and customers, to pay their employees, and to otherwise fund their operations during these Chapter 11 Cases is essential to the Debtors' continued viability. Moreover, the ability of the Debtors to obtain sufficient working capital and liquidity through the proposed post-petition financing arrangement with the Lenders as set forth herein, in the Interim Orders and in the DIP Facility Agreements is vital to the preservation and maintenance of the going concern value of the Debtors. Accordingly, the Debtors have an immediate need to obtain the post-petition financing in order to, among other things, permit the orderly continuation of the operation of their businesses, minimize the disruption of their business operations, and preserve and maximize the value of the assets of the Debtors' bankruptcy estates.

160. Prior to the Petition Date, the Debtors and the Lenders engaged in extensive, arm's-length negotiations with respect to the terms and conditions of each of the DIP Facility Agreements. Despite their efforts, the Debtors were unable to obtain financing in the form of unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code, as an administrative expense under section 364(a) or (b) of the Bankruptcy Code, or in exchange for the grant of an administrative expense priority pursuant to section 364(c)(1) of the Bankruptcy Code, without the grant of liens on assets. Indeed, the Debtors have been unable to procure the necessary financing on terms more favorable than the financing offered by the Lenders pursuant to the DIP Facility Agreements. As such, the Debtors are seeking approval of the DIP Facilities as set forth in the DIP Facility Agreements.

**B.**     **Use of Cash Collateral and Proposed Adequate Protection**

161. Under the terms of the DIP Facility Agreements, certain of the Debtors require the use of the Cash Collateral of the Senior Prepetition Lenders and the Prepetition Noteholders. The Cash Collateral (other than proceeds of the DIP Facilities prior to entry of the Final Orders)

and other proceeds from any Senior Prepetition Collateral will be used to reduce the amounts outstanding under the Senior Prepetition Loan Agreement as of the Petition Date, and the Debtors shall apply all such collateral to reduce such obligations on a permanent basis until repaid in full. After the payment of the Senior Prepetition Obligations in full, pursuant to the terms of the Subordination Agreement and the Junior Participation Agreement, all Cash Collateral shall be applied next to the Wells DIP Obligations (other than the Mistral Portion of the Wells DIP Facility) until repaid in full, then the Reser's DIP Facility until repaid in full, then the Mistral Portion of the Wells DIP Facility until repaid in full, and then to the Junior Participation Obligations until paid in full. If, however, the Agent makes Agent Advances under the terms of the Wells DIP Facility Agreement, the Cash Collateral will be used to reduce the obligations relating to such Agent Advances prior to the repayment in full of the Senior Prepetition Obligations. The Senior Prepetition Agent, for itself and for the Senior Prepetition Lenders, and Prepetition Noteholder Agent, have consented to the Debtors' use of Cash Collateral on the terms described in the DIP Facility Agreements, subject to the adequate protection liens and payments discussed in further detail in the Financing Motion and the other terms and conditions set forth in the Interim Orders.

### C. The DIP Facilities Should be Authorized

162.    The terms and conditions of the DIP Facility Agreements are fair and reasonable, and were negotiated extensively by well-represented, independent parties in good faith and at arm's-length. Approval of the DIP Facilities will provide the Debtors with immediate and ongoing access to borrowing availability to pay their current and ongoing operating expenses, including post-petition wages and salaries and utility and vendor costs. Unless these expenses are paid, the Debtors will be forced to cease operations, which would likely (i) result in irreparable harm to their business, (ii) deplete going concern value, and (iii) jeopardize the

59

Debtors' ability to maximize value.  The credit provided under the DIP Facility Agreements and the use of Cash Collateral will enable the Debtors to continue to satisfy their vendors, service their  customers, pay their employees, and operate their business in the ordinary course and in an orderly and reasonable manner to preserve and enhance the value of their estates for the benefit of all stakeholders.  The availability of credit under the DIP Facility Agreements will provide confidence to the Debtors' creditors that will enable and encourage them to continue their relationships with the Debtors.  Finally, the implementation of the DIP Facility Agreement will be viewed favorably by the Debtors' vendors, employees, and customers, thereby promoting a successful resolution of these Chapter 11 Cases.  Accordingly, the timely approval of the relief requested in the Financing Motion is imperative.

## CONCLUSION

To preserve the value of their business to the fullest extent possible, the Debtors' immediate objective is to maintain "business as usual" following the commencement of the Chapter 11 Cases by minimizing any adverse impact of the chapter 11 filings on the Debtors' operations.  For the reasons described herein and in the First Day Motions, I believe that the prospect for achieving these objectives for the benefit of creditors and other stakeholders will be substantially enhanced if this Court grants the relief requested in each of the First Day Motions.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: October 4, 2011          /s/ Susan Sarb
      Wheeling, Illinois       Name: Susan Sarb
                                             Title:   Chief Financial Officer, Senior Vice
                                             President and Secretary of each of the Debtors

RLF1 5411080v. 1